# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In Re
**PETER J. WOODFORD,**                                    Chapter 13
    Debtor                                    Case No. 06-10437-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**BLACKSMITH INVESTMENTS, LLC,**
    Plaintiff
v.                                                        Adv. P. No. 06-1233
**PETER J. WOODFORD**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by Blacksmith Investments, LLC

("Blacksmith" or the "Plaintiff") against the debtor, Peter J. Woodford ("Woodford" or the

"Debtor"). Through its Complaint, Blacksmith seeks, pursuant to 11 U.S.C. § 523(a)(2)(A),

to except from discharge an obligation relating to an "Agreement for Judgment and

Issuance of Execution" ("Agreement for Judgment") executed by the Debtor before the

commencement of his Chapter 7 case. Pursuant to the Agreement for Judgment, the Debtor

and MacSteel Erectors, Inc. ("MacSteel"), a now-defunct corporation that was wholly

1

owned by the Debtor, agreed to the entry of judgment, jointly and severally, in the sum of $200,000.  The Agreement for Judgment pertained to Counts II, III, IV, and V of a Verified Complaint which Blacksmith filed against Boston Steel & Precast Erectors Holdings Trust, Boston Steel and Pre-Cast [sic] Erectors, Inc., Kathleen MacInnis, MacSteel, and Woodford in the Suffolk Superior Court Department of the Trial Court.   In that proceeding, Blacksmith contended, among other things, that the Debtor conspired with Bernard MacInnis, Jr. ("MacInnis"), who served as one of two officers of Boston Steel and Precast Erectors, Inc. ("BSPE"), to create MacSteel and to transfer all of BSPE's assets to MacSteel to avoid paying its creditors.

The Court consolidated trial of Blacksmith's Complaint with its "Objection to Debtor's Exemption of Retirement Annuity."  On Schedule C-Property Claimed as Exempt, the Debtor initially chose the federal exemptions under 11 U.S.C. § 522(b)(2) and claimed the annuity as exempt in the sum of $205,796.72, referencing 11 U.S.C. §§ 522(d)(10)(E), (d)(12), as well as 11 U.S.C. § 541(c)(2). Blacksmith objected to the claim of exemption. Following Blacksmith's objection to his exemption of the annuity, the Debtor moved to amend Schedule C and filed an Amended Schedule C on April 24, 2006, electing the Massachusetts exemptions pursuant to 11 U.S.C. § 522(b)(3), and specifically claiming the annuity exempt pursuant to Mass. Gen. Laws 234, § 34A [sic].  Blacksmith never filed an objection to the Debtor's amended Schedule C.

On January 13, 2009, the Court conducted a trial at which two witnesses testified and seven exhibits were introduced into evidence.   Following the trial, the parties

2

submitted briefs. The issues presented are whether certain transfers, which the Debtor

conceded were fraudulent transfers voidable under Mass. Gen. L. Ch. 109A, § 5(a)(1) as

part of the Agreement for Judgment, amounted to a debt for money, property, or services

obtained by "false pretenses, a false representation, or actual fraud" which would except

the $200,000 debt from discharge under 11 U.S.C. § 523(a)(2)(A); and whether the Debtor

should be denied his claim of exemption with respect to the annuity because he borrowed

funds from his annuity based upon a false representation.

The Court now makes its findings of fact and conclusions of law in accordance with

Fed. R. Bankr. P. 7052.

## II. FACTS

BSPE was in the business of erecting large scale buildings and structures.  It was

organized on November 21, 2001 and dissolved involuntarily on May 31, 2007.  MacInnis

served as president, treasurer and sole director of BSPE, and his spouse, Kathleen

MacInnis, served as the assistant treasurer.

On January 15, 2002, BSPE entered into a transaction whereby it purchased certain

assets, including tools and equipment, from Boston Steel Erectors, Inc. ("BSE").  Following

the transaction, BSPE entered into a consulting contract with Robert J. Saraceno

("Saraceno"), BSE's president and treasurer. Saraceno testified that BSPE granted him a

security interest in all assets of BSPE.

Approximately two weeks after the sale transaction, on January 29, 2002, BSE,

through Saraceno, and BSPE, through MacInnis, as well as Boston Steel Erectors Holdings

Trust and Boston Steel & Precast Erectors Holdings Trust, executed and delivered a Demand Revolving Line of Credit Note (the "Note") in the amount of $1,200,000 to Citizens Bank of Massachusetts ("Citizens"). The Note required monthly payments and the full outstanding balance was due and payable on demand. The Note was secured by a lien on all of assets of BSPE and Boston Steel & Precast Erectors Holdings Trust and was guaranteed by Saraceno and MacInnis.

The Debtor, a union ironworker, had been an employee of BSE since the late 1990s and became an employee of BSPE in 2002. During the course of his employment, he had advanced to the position of foreman and had become involved in estimating jobs, using a computer program owned by BSPE for that purpose.

According to Saraceno, BSPE had sales, "in the neighborhood of six, seven million dollars," and employed about 110 workers. Despite its sales, in early 2003, it encountered serious financial difficulties. Saraceno advised MacInnis to refrain from drawing down BSPE's line of credit with Citizens and to concentrate on collection of its accounts receivable. On or about August 13, 2003, BSPE stopped making payments to Citizens.

Facing unemployment, the Debtor was receptive to MacInnis's idea to start a new company. With the assistance of MacInnis, the Debtor incorporated MacSteel on April 11, 2003. The Debtor was the sole officer and director of MacSteel, which employed MacInnis. In addition to shepherding the Debtor through the process of obtaining an attorney to incorporate MacSteel, MacInnis assisted him in opening a bank account for the company at Sovereign Bank, and both he and MacInnis had check signing authority.

4

MacSteel appropriated the tools, equipment, office files, computers and computer programs, including billing and estimating software, owned by BSPE for no consideration. Further, MacSteel used BSPE's office before moving its operations to the basement of MacInnis's home. MacSteel did not pay rent to MacInnis for use of space in the basement. MacSteel also employed BSPE's former office assistant, Renee Coyne, whom MacSteel paid "under the table." The Debtor also caused MacSteel to complete one of BSPE's contracts without any rebidding of the job. The Debtor received compensation in the sum of $130,000 from MacSteel. MacSteel eventually paid MacInnis the same salary.

In order to fund MacSteel's operations, the Debtor borrowed money from MacInnis. Additionally, he borrowed $50,000 from his annuity with the Iron Workers District Council of New England by representing that the purpose of the loan was to purchase a residence rather than to fund his new business. The Debtor repaid the loan in full in 2005.

As noted, MacSteel operated from BSPE's Saugus office, but later moved to McGinnis's basement. Saraceno visited BSPE's Saugus office to collect receivables and had the opportunity to observe operations. It is unclear whether he realized that MacSteel was utilizing BSPE's furniture, printers, computers, and software located there for its business operations. In March of 2004, MacSteel changed the location of its principal office from MacInnis's basement to Malden, Massachusetts.

The Debtor had no experience operating or managing a company before incorporating MacSteel. He continued with his responsibilities as foreman and relied upon MacInnis to assist him with office work and estimating jobs for fabricators. While the

Debtor's self-interest in remaining employed and receiving a lucrative salary were evident from his testimony, his lack of sophistication with respect to business matters also was evident.

On August 14, 2003, after BSPE defaulted on the Note, Citizens delivered a written demand for payment to BSPE. It also demanded payment from Saraceno on his guaranty. Blacksmith paid the full balance due under the Note, and, in consideration for repayment, Citizens, on November 6, 2003, executed an Allonge pursuant to which it assigned to Blacksmith all its rights under the Note. The principal amount due under the Note as of August 29, 2003 was $387,100, exclusive of interest, late charges, costs and expenses.

On or about February 23, 2004, Blacksmith commenced an action in Suffolk Superior Court, captioned Blacksmith v. Boston Steel & Precast Erectors, Inc., et al, Civ. No. 04-0775, seeking to recover approximately $387,000 from BSPE, Boston Steel & Precast Erectors Holdings Trust, Kathleen MacInnis, MacSteel, and the Debtor under a variety of legal theories. Blacksmith's Verified Complaint set forth the following counts: Count I: Action on the Note; Count II: Successor Liability - MacSteel; Count III: Actual Fraudulent Transfer - MacSteel (citing Mass. Gen. Laws ch. 109A, § 5(a)(1));[1] Count IV: Constructive Fraudulent

---

[1] The statute provides: "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor. . . ." Mass. Gen. Laws ch. 109A, § 5(a)(1).

Transfer - MacSteel (citing Mass. Gen. Laws ch. 109A, § 6(a);[2] Count V: Personal Liability

for Fraudulent Transfers - Woodford (citing Mass. Gen. Laws ch. 109A, §§ (5)(a)(1) and

6(a)); Count VI: Actual Fraudulent Transfer - Kathleen MacInnis; Count VII - Constructive

Fraudulent Transfer - Kathleen MacInnis; Count VII - Turnover of Collateral -MacSteel; and

Count IX: Preliminary Injunction - MacSteel.  Saraceno testified that after filing suit,

MacSteel turned over some of the tools and equipment that it obtained from BSPE to

Blacksmith, which sold them for an indeterminate sum.

On or about September 30, 2005, Blacksmith, Saraceno, MacSteel, and the Debtor

entered into a Settlement Agreement pursuant to which the Debtor agreed to entry of a

judgment against him in the amount of $200,000 on Counts II, III, IV and V.  The Settlement

Agreement provided that if Woodford paid Blacksmith $100,000 within 60 days,

Blacksmith would return to Woodford and MacSteel a copy of the Agreement for Judgment

marked "Satisfied in Full," and Woodford and MacSteel would have no further obligations

to Blacksmith.  The Settlement Agreement recited the following:

Woodford and MacSteel have denied that they have any liability whatsoever

---

[2] The statute provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a
creditor whose claim arose before the transfer was made or the obligation
was incurred if the debtor made the transfer or incurred the obligation
without receiving a reasonably equivalent value in exchange for the
transfer or obligation and the debtor was insolvent at that time or the
debtor became insolvent as a result of the transfer or obligation.

Mass. Gen. Laws ch. 109A, § 6(a).

to Blacksmith.  In addition, Woodford has provided to Saraceno, and Saraceno has relied upon, an executed Financial Statement, indicating that the only asset in which he holds an interest that may have any net, non-exempt equity is the Ironworkers District Council of New England Annuity Plan held at MassMutual Financial Group (the "Annuity).

Although Woodford may obtain the Settlement Payment from any source he may choose, the parties hereto recognize that it is the current intent of Woodford to make the Settlement Payment from the proceeds of the Annuity.  In the event that, in order to avoid penalties or taxes associated with the withdrawal of such proceeds, the Annuity must be taken by judicial process, such as execution or levy, Blacksmith agrees to provide reasonable assistance to Woodford in obtaining the proceeds from the Annuity, including proceeding by levy.  In the event that the process of withdrawing the proceeds takes longer than 60 days, Blacksmith agrees to extend the 60-day deadline for making the Settlement Payment, as may be reasonably necessary to complete the withdrawal.  Blacksmith further agrees that interest on the Agreement for Judgment shall be waived during the 60-day period, as may be extended.

Because the Agreement for Judgment called for a separate and final judgment to be entered against the Debtor under Mass. R. Civ. P. 54(b), the Superior Court held a hearing, signed the Agreement for Judgment on October 6, 2005, and entered it as a separate judgment on October 11, 2005.

The Debtor did not satisfy the Agreement for Judgment, and, on March 1, 2006, he filed a petition for relief under Chapter 13 of the Bankruptcy Code.  On Schedule I - Current Income of Individual Debtor(s), he disclosed that he was employed by T & T Erectors, Inc., earning gross monthly income of $5,439.90 or approximately one-half of what he made as the owner of MacSteel.  Blacksmith timely filed the instant Complaint seeking to except the $200,000 debt from discharge under 11 U.S.C. § 523(a)(2)(A).

As noted above, Blacksmith failed to object to the exemption claimed in the Debtor's

8

*amended* Schedule C pursuant to Mass. Gen. Laws ch. 235, § 34A. Neither party submitted evidence as to the nature of the annuity or whether it is qualified under the federal Employee Retirement Income Security Act of 1974 ("ERISA"), although Blacksmith's counsel conceded in his opening statement that the annuity was ERISA-qualified.

## III. DISCUSSION

 A. <u>Applicable Law under Section 523(a)(2)(A)</u>

 As grounds for its Complaint, Blacksmith relies solely upon 11 U.S.C. § 523(a)(2)(A), which excepts from discharge a debt of an individual debtor "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The United States Court of Appeals for the First Circuit has addressed issues under section 523(a)(2)(A) on multiple occasions, observing that, as with all exceptions to discharge under section 523(a), they are "narrowly construed . . . and the claimant must show that its claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a)." <u>McCrory v. Spigel (In re Spigel)</u>, 260 F.3d 27, 32 (1st Cir. 2001)(citing <u>Century 21 Balfour Real Estate v. Menna (In re Menna)</u>, 16 F.3d 7, 9 (1st Cir. 1994)). In <u>Spigel</u>, the First Circuit, while noting that the Supreme Court overruled its formulation of the reliance element of the test for nondischargeability under section 523(a)(2)(A),[3] articulated the following requirements for

---

 [3] It stated: "As originally formulated in this circuit, a creditor's reliance had to be reasonable. <u>Commerce Bank & Trust Co. v. Burgess</u>, 955 F.2d 134, 140 (1st Cir.1992); <u>Century 21 Balfour Real Estate</u>, 16 F.3d at 10. The Supreme Court, however, has since

establishing an exception to discharge under section 523(a)(2)(A):

> [W]e have said that the statutory language does not "remotely suggest that nondischargeability attaches to any claim other than one which arises as a direct result of the debtor's misrepresentations or malice." <u>Century 21 Balfour Real Estate</u>, 16 F.3d at 10. Thus, in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage. <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir.1997). Though the first two elements of the <u>Palmacci</u> test describe the conduct and scienter required to show fraudulent conduct generally, the last four embody the requirement that the claim of the creditor arguing nondischargeability in an adversary proceeding must arise as a direct result of the debtor's fraud.

<u>Spigel</u>, 260 F.3d at 32 (footnotes omitted).

The allegations of Blacksmith's Complaint and the evidence adduced at trial do not fit neatly within the First Circuit's formulation of the requirements for relief under section 523(a)(2)(A). Blacksmith submitted no evidence with respect to any of the required elements set forth by the court in <u>Spigel</u>. Rather, Blacksmith urges this Court to adopt the holding of <u>McClellan v. Cantrell</u>, 217 F.3d 890, 893 (7th Cir. 2000), and its progeny. *See* <u>Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)</u>, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001)("actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. . . . When a debtor intentionally engages in a scheme to deprive

---

overruled this formulation and, drawing from the Restatement (Second) of Torts, held that a creditor's reliance need only be justifiable. <u>Field v. Mans</u>, 516 U.S. 59, 70-71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)." <u>Spigel</u>, 260 F.3d at 32 n.6.

or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code."); K-B Building Co. v. Barber (In re Barber), 281 B.R. 617, 624 (Bankr. W.D. Pa. 2002); and Gentry v. Kovler (In re Kovler), 249 B.R. 238, 260-61 (Bankr. S.D.N.Y. 2000).

In McClellan, the United States Court of Appeals for the Seventh Circuit considered an appeal from the dismissal of a creditor's complaint under section 523(a)(2)A) for failure to state a claim and the issue of whether, as the bankruptcy court and the district court ruled, fraud for purposes of section 523(a)(2)(A) can only involve a deliberate misrepresentation or a deliberately misleading omission. Id. at 892. The facts set forth by the Seventh Circuit in McClellan warrant a full discussion as they are somewhat analogous to those present in the instant case. The Seventh Circuit, which was required to accept the allegations in the complaint as true in view of the procedural posture of the case, stated the facts as follows:

> In 1989 McClellan, the creditor, sold his business assets, consisting of ice-making machinery, to the debtor's brother for $200,000, payable in installments. McClellan retained, but did not perfect, a security interest in the machinery. The brother defaulted, owing McClellan more than $100,000. McClellan sued the brother in an Illinois state court, seeking among other things an injunction against the brother's transferring the machinery. With the suit pending, the brother "sold" the machinery to his sister, the debtor. The bill of sale recites the price as $10, and there is no reason to believe that it was more; we may assume therefore that it was a gratuitous transfer. The sister knew about the suit and in accepting the transfer of the machinery was colluding with her brother to thwart McClellan's collection of the debt that her brother owed him. She turned around and sold the machinery for $160,000-and she's not telling anyone what has happened to that money.
>
> The sale took place in 1994 and the following year McClellan added the sister as a defendant in his state court action, claiming that her brother's transfer

11

of the machinery to her had been a fraudulent conveyance. 740 ILCS 160/5. Two years later, with the state court suit still pending, the sister filed for bankruptcy under Chapter 7. Fearing lest her debt to him be discharged at the conclusion of the bankruptcy proceeding, McClellan filed an adversary proceeding against her seeking to recover the debt that he alleged she owed him as the recipient of a fraudulent transfer of the assets that secured her brother's debt. The bankruptcy court dismissed his complaint on the ground that the debt was dischargeable, and the district court affirmed . . . .

McClellan, 217 F.3d at 892.

The Seventh Circuit began its analysis of applicable law under section 523(a)(2)(A) by noting that "[n]othing in the Supreme Court's opinion [in Field v. Mans, 516 U.S. 59, 68 (1995)] suggests that misrepresentation is the only type of fraud that can give rise to a debt that is not dischargeable under section 523(a)(2)(A)." Id. It also observed that although most frauds do involve misrepresentations, section 523(a)(2)(A) is not limited to "fraudulent misrepresentations," id. at 893, adding that by distinguishing between "a false representation" and "actual fraud," the statute makes clear that actual fraud is broader than misrepresentation." Id. (citing 4 Collier on Bankruptcy ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)( section 523(a)(2)(A) defines "actual fraud" as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another").

The Seventh Circuit also stated that the type of conduct of which McClellan complained turned bankruptcy into "an engine for fraud" and that while exceptions to discharge should be construed narrowly, the exceptions do "serve vital functions," such as preventing fraud. Id. It thus determined:

Fraud is a generic term, which embraces all the multifarious means which

human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

Id. (citing Stapleton v. Holt, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla.1952)).

The court in McClellan distinguished between actual and constructive frauds. It observed that "[t]o transfer property for less than adequate consideration may be desperate, foolish, or imprudent, and the receipt of such a transfer a pure windfall, . . . neither the transfer nor the receipt is in and of itself dishonest, and so neither is an appropriate ground for refusing to allow the debtor to discharge the debt arising from the transfer." McCllenan, 217 F.3d at 894. It further explained the ramifications of the distinction:

[W]hen a conveyance is merely constructively fraudulent, in the sense that having transferred the property that secured the debt without obtaining adequate consideration the debtor is now unable to pay his creditor, the transferee is not guilty of an actual fraud against the creditor and so the creditor cannot use section 523(a)(2)(A) to prevent the transferee from discharging the debt in bankruptcy. And so in this case, if though the debtor's brother intended to thwart McClellan and was thus committing actual fraud, his sister was innocent-if she had no intention of hindering any creditor-the debt that McClellan is seeking to collect from her would not have been obtained by her by actual fraud. But she is alleged to have been a full and equal participant in her brother's fraud, to have been in effect his accomplice, as in Cenco v. Seidman & Seidman, 686 F.2d 449, 452-453 (7th Cir.1982). The debt that McClellan is seeking to collect from her (and prevent her from discharging) arises by operation of law from her fraud. That debt arose not when her brother borrowed money from McClellan but when she prevented McClellan from collecting from the brother the money the brother owed him.

Id. at 894-95.

13

The United States Court of Appeals for the First Circuit has not adopted the approach taken by the Seventh Circuit; nor has it unequivocally rejected it.  In <u>Spigel</u>, the First Circuit observed:

> We note that the Seventh Circuit has recently called into question whether the <u>Palmacci</u> test should properly be considered the exclusive test to determine nondischargeability under § 523(a)(2)(A). In <u>McClellan v. Cantrell</u>, 217 F.3d 890 (7th Cir.2000), that court noted that <u>Palmacci</u> and similar cases have adopted a test that focuses solely upon false representations as the total universe of fraud under § 523(a)(2)(A), in large part because false representations were the only fraud before those courts. <u>Id.</u> at 892. § 523(a)(2)(A), however, explicitly lists both "actual fraud" and "false representations" as grounds for denying a discharge, a distinction in the statutory language that the <u>McClellan</u> court relied upon to hold that "actual fraud" encompasses more than misrepresentations. <u>Id.</u> at 892-93; *see also* <u>Mellon Bank N.A. v. Vitanovich</u>, 259 B.R. 873, 876 (6th Cir. BAP 2001) (adopting <u>McClellan's</u> definition of actual fraud to evaluate nondischargeability of a debt created by a check kiting scheme). Though there are differences between <u>McClellan</u> and <u>Palmacci</u>-the most significant of which concerns whether reliance is required-we do not decide whether we would adopt the Seventh Circuit's reasoning. <u>McClellan</u> is consistent with our existing precedent in that it also requires *a direct link between the alleged fraud and the creation of the debt*. <u>McClellan</u>, 217 F.3d at 894-95 (noting that the actual fraud denied discharge under § 523(a)(2)(A), as opposed to constructive fraud, requires a showing that the fraud created the debt); *see also, e.g.,* <u>Century 21 Balfour Real Estate</u>, 16 F.3d at 10.

<u>Spigel</u>, 260 F.3d at 32 n. 7(emphasis supplied).

The direct link between the alleged fraud - - the conspiracy between the Debtor and MacInnis to acquire BSPE's assets for no consideration - - and the creation of the debt is the key here.  This Court would have to conclude that the Debtor's receipt, as the alter ego of MacSteel, of fraudulently transferred property to MacSteel by BSPE created a new debt to Citizens Bank and its assignee, Blacksmith. The debt which Blacksmith seeks to except from discharge was money owed to Citizens that was secured by a security interest in BSPE's

14

assets.  The Debtor, in executing the Agreement for Judgment, conceded that the transfer

of BSPE's equipment to MacSteel was "with actual intent to hinder, delay, or defraud"

creditors of BSPE as alleged in both Counts II and V. *See* Mass. Gen. L. Ch. 109A, § 5(a)(1).

Although Blacksmith was not a creditor of BSPE, as it did not acquire the Citizens debt

until November of 2003, after the BSPE had transferred its assets to MacSteel,  Citizens was

such a creditor.  The Agreement for Judgment was endorsed by the Superior Court and

that judgment is a final judgment entitled to preclusive effect as to the existence of a n

intentionally fraudulent transfer.  *See* Arrieta-Gimenez v. Arrieta-Negron, 859 F.2d 1033,

1041 (1st Cir.1988)(judgments entered pursuant to valid consent agreements are afforded

the "same preclusive effect as judgments in litigated cases.").

The question in this case turns then on whether the First Circuit would follow the

Seventh Circuit's holding in McClellan.  Additionally, to the extent that the Debtor

received property in fraud on Citizens, it is unclear whether the amount of that debt is

measured by the  amount of $200,000 set forth in the Agreement for Judgment or the value

of the property acquired by MacSteel.

In the absence of a clear indication from the First Circuit, this Court lacks the

sanguinity of the Seventh Circuit in side stepping the decision of the Supreme Court in

Field v. Mans, 516 U.S. 59 (1995).  In that case, the Supreme Court set forth the statutory

language of section 523(a)(2) and its precursors in a compelling fashion.  It stated:

> These provisions were not innovations in their most recent codification, the
> Bankruptcy Reform Act of 1978 (Act), Pub.L. 95-598, 92 Stat. 2590, but had
> obvious antecedents in the Bankruptcy Act of 1898 (1898 Act), as amended,
> 30 Stat. 544. The precursor to § 523(a)(2)(A) was created when § 17(a)(2) of

15

the 1898 Act was modified by an amendment in 1903, which provided that debts that were "liabilities for obtaining property by false pretenses or false representations" would not be affected by any discharge granted to a bankrupt, who would still be required to pay them. Act of Feb. 5, 1903, ch. 487, 32 Stat. 798. This language inserted in § 17(a)(2) was changed only slightly between 1903 and 1978, at which time the section was recodified as § 523(a)(2)(A) and amended to read as quoted above. Thus, since 1903 the statutory language at issue here merely progressed from "false pretenses or false representations" to "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

Id. at 64-65 (footnote omitted).  The Supreme Court concluded:

The operative terms in § 523(a)(2)(A) . . . "false pretenses, a false representation, or actual fraud," carry the acquired meaning of terms of art. They are common-law terms, and, as we will shortly see in the case of "actual fraud," which concerns us here, they imply elements that the common law has defined them to include.  See Durland v. United States, 161 U.S. 306, 312, 16 S.Ct. 508, 510, 40 L.Ed. 709 (1896); James-Dickinson Farm Mortgage Co. v. Harry, 273 U.S. 119, 121, 47 S.Ct. 308, 309, 71 L.Ed. 569 (1927). Congress could have enumerated their elements, but Congress's contrary drafting choice did not deprive them of a significance richer than the bare statement of their terms.

Id. at 69.  The Court added:

Since the District Court treated Mans's conduct as amounting to fraud, we will look to the concept of 'actual fraud' as it was understood in 1978 when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. Id., § 537."

516 U.S. at 70 (footnotes omitted).

This Court agrees with the Court in Bunsinger v. Storer (In re Storer), 380 B.R. 223

(Bankr. D. Mont. 2007), that "[t]he determination of nondischargeability under §

523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A)

16

mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A." 380 B.R. at 231 (citing <u>Field v. Mans</u>, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995)). In short, absent a clear directive from the First Circuit, this Court remains bound by the elements comprising the common law formulation of "actual fraud" enunciated by the court in <u>Spigel</u>.

Rather than depart from the accepted common law elements for relief under section 523(a)(2)(A), section 523(a)(6) presents another avenue upon which a creditor may obtain a determination of nondischargeability if there exists a transfer with actual intent to hinder deceive and defraud creditors. The Seventh Circuit in <u>McClellan</u> recognized this possibility, stating: "For completeness we note that it might also be possible to shoehorn the facts of this case into another provision of section 523, the provision that excludes from discharge debts arising from "willful and malicious injury by the debtor to another entity or to the property of another entity." But why shoehorn?" 217 F.3d at 896 (citations omitted). *See also* <u>McCain Foods USA Inc. v. Shore (In re Shore)</u>, 317 F.3d 536 (B.A.P. 10th Cir. 2004). Indeed, in a concurring opinion in <u>McClellan</u>, Judge Ripple indicated that he would hold that section 523(a)(6) would require an exception to the discharge of McClellan's debt. He stated:

> Given the overall structure of § 523, it seems clear that Congress intended § 523(a)(2)(A) to cover debts relating to the procurement of money or property by fraud and § 523(a)(6) to apply in a situation such as the one before us. Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-(A) false pretenses, a false representation, or actual fraud. . . ."

17

11 U.S.C. § 523(a)(2). The language "obtained by" clearly indicates that the fraudulent conduct occurred at the inception of the debt, i.e., the debtor committed a fraudulent act to induce the creditor to part with his money or property. Ms. Cantrell played no role, fraudulent or otherwise, in inducing Mr. McClellan to part with his money or property.  Nevertheless, the majority makes a plausible argument that a literal, although perhaps strained, reading of § 523(a)(2)(A) would permit the subsection to cover the situation before us. Section 523(a)(6), however, more easily covers our facts because it reaches any debt for willful and malicious injury to another's property.  I think it is important to point out that § 523(a)(6) provides a far more direct avenue for dealing with a situation such as the one we have before us.

217 F.3d at 896.

In summary, this Court rejects Blacksmith's reliance upon <u>McClellan</u>.  Because the fraudulent transfer made to MacSteel and the Debtor of BSPE's property in fraud on its creditors does not fit within the parameters of common law "actual fraud" as articulated by the Supreme Court in <u>Field v. Mans</u> and because of the absence of a clear directive from the United States Court of Appeals for the First Circuit, this Court refuses to find that Blacksmith sustained its burden of establishing all the common law elements required by decisions in this circuit.  *See, e.g.*, <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803, 814 (B.A.P. 1st Cir. 2005).[4]

---

[4] This Court notes that Blacksmith did not argue that the Agreement for Judgment satisfied the elements for actual fraud as articulated by the courts in <u>Spigel</u>, 260 F.3d at 32 and <u>Aoki</u>, 323 B.R. at 814.  Moreover, it did not argue the relevance of, or even cite, the Supreme Court's decision in <u>Archer v. Warner</u>, 538 U.S. 314 (2003). Moreover, the Plaintiff did not include a count seeking to except the debt from discharge under 11 U.S.C. § 523(a)(6) and did not move to amend the complaint to include such a count at any time.

18

B. Annuity Exemption

Although the Debtor did not reference section 541(c)(2) on amended Schedule C,

citing instead Mass. Gen. Laws ch. 235, § 34A,[5] he argues that his annuity is ERISA-

qualified and further that an ERISA-qualified annuity is not property of the bankruptcy

estate. *See* 11 U.S.C. §541(c)(2)("A restriction on the transfer of a beneficial interest of the

---

[5] Section 34A provides:

The right or interest of any person in an annuity, pension, profit sharing or other retirement plan subject to the federal Employee Retirement Income Security Act of 1974, in any plan maintained by one or more self-employed individuals as a Keogh Plan, so-called, in any plan maintained by a corporation or other business organization pursuant to section 401(a) of the Internal Revenue Code but not subject to the federal Employee Retirement Income Security Act of 1974, or in any Simplified Employee Plan, annuity plan to which the provisions of section 403(b) of the Internal Revenue Code apply or Individual Retirement Account or Annuity maintained by an individual, or in any annuity or similar contract distributed from or purchased with assets distributed from any of the foregoing, shall be exempt from the operation of any law relating to insolvency and shall not be attached or taken on execution or other process to satisfy any debt or liability of such person, except as may be necessary to satisfy (i) an order of a court of competent jurisdiction concerning divorce, separate maintenance or child support or (ii), in the event of the conviction of such person of a crime, an order of a court requiring such person to satisfy a monetary penalty or make restitution to the victim of such crime. The exemption in this section for plans maintained by an individual, whether or not self-employed, shall not apply to sums deposited, determined without regard to deposits pursuant to a rollover or transfer except to the extent protection under this section would be limited in the absence of a rollover or transfer, in said plans during the five year period preceding the individual's declaration of bankruptcy or entry of judgment in excess of 7 per cent of the total income of such individual for such period.

Mass. Gen. Laws ch. 325, § 34A.

debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title."). Blacksmith's counsel conceded that the annuity is ERISA-qualified, although in its brief, Blacksmith did not specifically address whether the Debtor's annuity is or is not part of his bankruptcy estate.

Pursuant to the Supreme Court's decision in <u>Patterson v. Shumate</u>, 504 U.S. 753 (1992), if a debtor had a beneficial interest in an ERISA-qualified plan, it is excluded from property of the estate under 11 U.S.C. § 541(c)(2)(an antialienation provision in an ERISA-qualified pension plan constitutes a restriction on transfer enforceable under "applicable nonbankruptcy law" for purposes of the § 541(c)(2) exclusion of property from the debtor's bankruptcy estate.). Nevertheless, Blacksmith argued that because the Debtor obtained funds from the annuity through a fraudulent representation the annuity should be considered property of the estate.

Blacksmith's position is untenable for a variety of reasons. In the first place, the Court has determined that its debt is dischargeable. Accordingly, Blacksmith cannot attempt to collect its debt from the annuity. Moreover, Blacksmith failed to set forth any cogent theory that would cause property that is excluded from property of the estate to be transformed into property of the estate because of the Debtor's conduct. Blacksmith failed to provide this Court with sufficient evidence or legal authority to permit it to proceed against the Debtor's interest in his annuity under applicable Massachusetts law.

Alternatively, if the Debtor properly exempted the annuity from property of the estate, the provisions of 11 U.S.C. § 522(c) apply to shield the annuity from the reach of

creditors.  Section 522(c) provides in pertinent part the following:

> (c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case . . . .

11 U.S.C. § 522(c).[6]  Because this Court has ruled that Blacksmith failed to satisfy its burden under 11 U.S.C. § 523(a)(2)(A), and the Debtor claimed it as exempt on Schedule C, the annuity is not liable for satisfaction of the debt, unless the Court were to sustain Blacksmith's objection to the Debtor's claimed exemption .

Blacksmith urges the Court to find that the Debtor's borrowing from his annuity to fund MacSteel precludes him from exempting the annuity from his bankruptcy estate and permits it to satisfy its state court judgment from the funds.  It is true that ". . . the shield of exemption may be penetrated in extreme circumstances where there is fraudulent conduct or a clear showing of bad faith."  Pineo v. Bogan (In re Pineo), 302 B.R. 524, 529 (Bankr. W.D. Pa. 2003)(denying exemption where debtor secretly embezzled $400,000 from employer postpetition); see also Wood v. Premier Capital, Inc. (In re Wood), 291 B.R. 219,227-28 (B.A.P. 1st Cir. 2003)(denying exemption where debtor concealed workers' compensation claim); In re Koss, 319 B.R. 317,323 (Bankr. D. Mass. 2005)(rejecting debtor's argument that § 522(c) prevented the trustee from surcharging his exemption when he had converted nonexempt assets and stating that debtor "may not employ § 522(c) as a shield."); and In re Stinson, 221 B.R. 726 (E.D.Mich. 1998)(denying exemption where debtor

---

[6] The statute set forth a number of exceptions but none are applicable in the instant case.

settled postpetition personal injury claim for $20,000 without bankruptcy court's authority).  In all of these cases, however, the debtor concealed property obtained postpetition from the bankruptcy trustee.

In the instant case, the Court need not address Blacksmith's alternative argument as it failed to file an objection to the Debtor's amended Schedule C and otherwise failed to sustain its burden that the exemption was not properly claimed under Mass. Gen. Laws ch. 235, § 34A by filing a timely objection to amended Schedule C.  Section 522(l) and Federal Rule of Bankruptcy Procedure 4003 compel the Court's conclusion.  Section 522 provides:

> (l) The debtor shall file a list of property that the debtor claims as exempt under subsection (b) of this section. If the debtor does not file such a list, a dependent of the debtor may file such a list, or may claim property as exempt from property of the estate on behalf of the debtor. *Unless a party in interest objects, the property claimed as exempt on such list is exempt.*

11 U.S.C. § 522(l)(emphasis added). Rule 4003 provides, in relevant part:

> **(b) Objecting to a claim of exemptions**
>
> (1) Except as provided in paragraphs (2) and (3), a party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341(a) is concluded *or within 30 days after any amendment to the list or supplemental schedules is filed, whichever is later.* The court may, for cause, extend the time for filing objections if, before the time to object expires, a party in interest files a request for an extension.
>
> ***
>
> **c) Burden of proof**
>
> In any hearing under this rule, the objecting party has the burden of proving that the exemptions are not properly claimed. . . .

Fed. R. Bankr. P. 4003(b)(1) and (c).  Thus, under either scenario posed by Blacksmith, the

discharge of the underlying debt precludes it from reaching the annuity to satisfy the

Agreement for Judgment.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Defendant

on Count I of the Plaintiff's Complaint.[7]   The Debtor's obligation to Blacksmith is not

excepted from discharge pursuant to section 523(a)(2)(A).   Further, the Court overrules

Blacksmith's "Objection to Debtor's Exemption of Retirement Annuity" as moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: April 13, 2009
cc: David B. Madoff, Esq., Jeffrey J. Cymrot, Esq.

---

[7] The Plaintiff orally withdrew Count II of the Complaint.

23